USDC SCAN INDEX SHEET










TKL 5/18/05 8:47

3:04-CV-02244 DEPT OF PARKS V. BAZAAR DEL MUNDO INC

*26*

*O.*

FILED
05 MAY 17 PM 4:16
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

DEPARTMENT OF PARKS AND RECREATION FOR THE STATE OF CALIFORNIA,

Plaintiff,

vs.

BAZAAR DEL MUNDO, INC.,

Defendant.

CASE NO. 04cv2244 JM(JMA)

ORDER DENYING MOTION FOR JUDGMENT ON THE PLEADINGS; DENYING MOTION FOR PRELIMINARY INJUNCTION

Defendant Bazar Del Mundo ("BDM") moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff Department of Parks and Recreation for the State of California ("DPR") separately moves to preliminarily enjoin BDM from utilizing the service marks CASA DE BANDINI and CASA DE PICO.[1] All motions are opposed. For the reasons set forth below, the Rule 12(c) motion is denied and the motion for preliminary injunction is denied.

**BACKGROUND**

The underlying dispute between BDM and DPR involves a contest for intellectual property rights in connection with the marks CASA DE BANDINI and CASA DE PICO. BDM claims trademark rights to the names arising from its decades'

[1] The terms "CASA DE BANDINI" and "CASA DE PICO" refer to the service marks and the terms "Casa de Bandini" and "Casa de Pico" refer to the physical buildings.





long use of the names, the United States Patent and Trademark registration of the trademarks, and the State of California registration of the trademarks. DPR claims trademark rights to the names arising from its purchase and use of the historic San Diego property known as Old Town San Diego State Historic Park and that BDM's use of the trademarks is permissive pursuant several Concession Agreements.

**DPR's Acquisition and Use of the Real Property**

In 1968, by virtue of a condemnation judgment entered by the San Diego County Superior Court, the State of California acquired title to about 14 acres of land to establish the Old Town San Diego Historic Park. Included in the sale were two parcels of land encompassing the Casa de Pico and Casa de Bandini properties. The Casa de Pico building was originally built in 1824 by Pio Pico, the last Mexican governor of California. The building "has been known as CASA DE PICO in one form or another for" 180 years.[2] (DPR's Motion at pp.2:25-3:1). Prior to the acquisition of the property, the building operated as a motel by the name of "Casa de Pico Motel." The Casa de Bandini building was originally built in 1829 by Don Juan Bandini, an Italian immigrant from Peru. In the 1860s the building became a hotel and stage station, which included a restaurant. (Compl. ¶9). Casa de Bandini was registered as a California Historical Landmark in 1932.

Both before and after DPR's acquisition of the properties, the buildings were referred to as Casa de Bandini and Casa de Pico on promotional, educational, and historical materials. (Patterson Decl. Exhs. B-H, K, L, N, O-R, U, V). When the Old Town property was acquired, the buildings were used to house shops and the Casa de Bandini building served as the headquarters for the celebration of San Diego's 200 years of founding, called "Fiesta 200." (Compl. ¶¶9, 10).

---

[2] The original Casa de Pico building no longer exists. The present structure was built as a hotel in 1939.

**The Concession Agreements and BDM's Use of the Properties**

In June 1971 DPR entered into a Concession Agreement with BDM to operate concessions including restaurants in the Casa de Pico building. In 1972 the parties entered into Amendment No. 2 to the Concession Agreement which permitted BDM to expand its concession activities into Casa de Bandini. In 1981 the parties executed Amendment No. 3 to the Concession Agreement which granted BDM the right to operate "Casa de Pico, Lino's, Hamburguesa, and Casa de Bandini [as] restaurants." (Compl. ¶13).

BDM has continuously operated its CASA DE PICO Mexican restaurant in Old Town since 1971 and the CASA DE BANDINI restaurant since 1980. In 1985, BDM filed applications for registration of the marks CASA DE PICO and CASA DE BANDINI. After publication of the service marks, the USPTO granted Federal Registration to BDM for the mark CASA DE BANDINI on July 16, 1985 and for CASA DE PICO on October 8, 1985. DPR alleges that BDM never advised or sought permission from DPR prior to seeking USPTO registration. DPR also alleges that BDM does not display or use the federal registration notation ® or the common law trademark notation TM in connection with these names in its literature and website but does use and display the ® notation in its literature and website in connection with its own name and registered mark "Bazar del Mundo."

**DPR's Claims**

Based upon the above generally described conduct, DPR alleges six causes of action. The first claim is for declaratory judgment of trademark ownership under Cal.Code Civ.Proc. §1060. DPR alleges that the marks have acquired secondary meaning and the benefit of "BDM's use of the marks, including good will, inures to Plaintiff, the owner of the historic buildings and the licensor of the marks." (Compl. ¶22). The second claim seeks to rectify the trademark registration by identifying DPR as the registrant owner, and not BDM. The third claim seeks to invalidate the Federal Registration marks on the ground that BDM submitted a false or fraudulent declaration

in support of registration by declaring under penalty of perjury "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce." (Compl. ¶28). The fourth claim alleges that BDM's assertion of ownership rights in the marks violates Cal. Bus. &Prof. Code §17200. The fifth claim alleges that BDM's assertion of ownership rights in the marks constitutes an unfair, deceptive, and misleading advertising in violation of Cal.Bus. & Prof. Code 17500.

## DISCUSSION

**The Rule 12(c) Motion**

A Rule 12(c) motion challenges the legal sufficiency of an opposing party's pleadings. Fed.R.Civ.P. 12(c). Like a Rule 12(b)(6) motion, the court must assume the truthfulness of the material facts alleged in the complaint and all inferences reasonably drawn from the allegations must be construed in favor or the responding party. See General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church, 887 F.2d 228, 230 (9th Cir. 1989). A party is not entitled to judgment on the pleadings if the complaint raises issues of fact which, if proved, would support the plaintiff's legal theory. Id. Judgment on the pleadings may not be granted "unless it appears beyond a doubt that the [non-moving] party cannot prove any facts that would support his claim for relief." R.J. Corman Derailment Services, LLC v. International Union of Operating Engineers, Local Union 150, AFL-CIO, 335 F.3d 643, 647 (7th Cir. 2003).

BDM contends that it is entitled to judgment on the pleadings because DPR cannot establish any ownership interest in the marks CASA DE PICO and CASA DE BANDINI. Absent any interest in the marks, BDM concludes that DPR cannot prevail on any claim and therefore judgment on the pleadings must be granted in its favor. The difficulty with BDM's argument is that DPR alleges that it obtained ownership interest in the marks when it purchased the properties and began using the marks in reference to the historical buildings and the commercial and non-commercial activities conducted

therein. DPR further alleges that BDM's use of the marks was permissive pursuant to the concession agreement.

A trademark is defined as any word, name, symbol or device used to identify and distinguish goods or services, including a unique product or service, from those manufactured, sold or rendered by others, and to indicate the source of those goods and services, even if that source is unknown. See 15 U.S.C. §1127. A mark subject to registration must be capable of distinguishing the registrant's services from those of another. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). A service mark is "distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." Id. at 769. Among other things, DPR alleges that it used the historic names in reference to recreational and tourism services provided at the building sites prior to BDM's use of the names, (Compl. ¶¶ 9, 10, 21), and therefore the names acquired secondary meaning. Accepting these allegations as true, the court concludes that DPR states a prima facie claim to the right to use the service marks CASA DE BANDINI and CASA DE PICO.

BDM contends that the limited use of the marks during the "Fiesta 200" festival was "fleeting" and not entitled to trademark protection. (Motion at p.9:14-16). The difficulty with this argument is that it calls upon the court to determine the factual issue of whether DPR's use of the mark was of sufficient duration to constitute a protectable interest, or, rather an isolated and sporadic use not subject to protection. Under the present circumstances, the court accepts the allegation as true and notes that such a fact-based inquiry is better left to an evidentiary-based motion or the time of trial.

BDM also claims that DPR is judicially estopped from asserting any rights to the trademarks because, in a prior action before Judge Whelan involving the same trademarks, DPR represented that BDM's claims were premature and unripe because "[t]here is, as yet, no identified infringing use [of the trademarks] in commerce, as required by the Lanham Act." (Motion at p.14:15-16). DPR represents that its

position, contrary to BDM's contention, was that the "claims for trademark infringement were unripe because BDM was still utilizing the marks as a holdover tenant, and there was no threatened use in commerce by any other entity at that time." (BDM's Request for Judicial Notice, Exhs. 12, 13). DPR explains that the issue is now ripe because BDM's status as a holdover tenant was to terminate on March 15, 2005 and that BDM has indicated that it intends to use the marks to identify new restaurants. Under the circumstances identified by DPR, the doctrine of judicial estoppel does apply. See New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001).

In sum, the motion for judgment on the pleadings is denied.

**Motion for Preliminary Injunction**

Legal Standards

Preliminary injunctive relief is available if the party meets one of two tests: "(1) a combination of probable success and the possibility of irreparable harm, or (2) serious questions are raised and the balance of hardships tips in its favor." Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Id. Under both formulations, however, the party must demonstrate a "fair chance of success on the merits" and a "significant threat of irreparable injury." Id; Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999). Further, if a case implicates the public interest, the court also must consider this factor. See Caribbean Marine Svcs. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).

Success on the Merits

In order to prevail on any of its claims, DPR must demonstrate that it has a protectable trademark interest. A trademark is defined as any word, name, symbol or device used to identify and distinguish goods or services, including a unique product or service, from those manufactured, sold or rendered by others, and to indicate the source of those goods and services, even if that source is unknown. See 15 U.S.C.

§1127. Trademark ownership is not acquired through federal or state registration, but arises under the "common law from prior exclusive appropriation or adoption and use." Pacific Supply Cooperative v. Farmers Union Central Exchange, Inc., 318 F.2d 894, 905 (9th Cir. 1963); United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90 (1918); Great Basin Brewing Co. V. Healdsburg Brewing Co., 44 U.S.P.Q.2d 1751 (D. Nev. 1999) ("Ownership of a trademark is established by use of the mark, not by federal registration thereof.").

DPR asserts that it obtained a protectable interest in the marks by two different means: (1) through the common law by virtue of its purchase of the real property containing the historic buildings and (2) by virtue of the concession agreement whereby it granted BDM the right to use the marks. In the reply brief, DPR also argues that it obtained common law rights because of its use of the marks in connection with recreational services. Each argument is discussed in turn.

The Common Law Ownership Rights

DPR contends that its ownership of the Casa de Pico and Casa de Bandini buildings is sufficient, without more, to establish that it retains the "common law rights to ownership of the marks." (Motion at p.9:20-21). For this sweeping proposition DPR relies upon Norden Restaurant Corp. v. Sons of Revolution, 51 N.Y.2d 518, 210 U.S.P.Q. 944 (1980) and O'Grady v. McDonald, 72 N.J.Eq. 805, 66 A. 175 (1907). These authorities are inapposite. In Norden the owner of the building specifically granted the tenant the right to operate a restaurant entitled "Fraunces Tavern Restaurant" in its building. The building had been known as the Fraunces Tavern Restaurant since the 18th century. 210 U.S.P.Q. at 944. The tenant, whose family had operated the restaurant for 40 years claimed that it acquired the exclusive right to use the name. The court concluded that two provisions in the lease clearly indicated the landlord's "ownership of the name." Id. at 945. The lease specifically required the tenant to use the name "Fraunces Tavern Restaurant" and expressly provided that the tenants right to use the name was limited to conducting the restaurant business on the

premises and "no other business or location, and such right." Id. at 944. Thus, this authority, applying contract principles, does not stand for the proposition that mere ownership of a historic building, without more, gives the owner the absolute right to use the name of the building.

In O'Grady, the landlord owned a hotel named "The Hotel Dominion" and leased the hotel to the defendant operator. The operator managed the hotel for one year and then opened a competing hotel within a few hundred feet of landlord's hotel and called the hotel "The New Dominion." Defendant operator defended against Plaintiff's claim by arguing that the good reputation of landlord's hotel was largely due to her labors. The court found the operator's argument "wholly immaterial," 72 N.J.Eq. at 806. The court reasoned "if during the year of her tenancy the reputation of the hotel was improved by reason of her labors, that fact cannot properly be held to entitle her to the use of the name for an opposition hotel at the end of her term. Had the name been one of her own adoption... and not one which she only became entitled to use because she was a tenant of the property of complainant, an altogether different condition might exist." Accordingly, O'Grady does not stand for the proposition that DPR owns the trademarks as a matter of law because it is the owner of the buildings..

More pertinent authorities are cited by BDM. For example, in Woodward v. Lazar, 21 Cal. 448 (1863), the plaintiff leased land from a landlord and built and operated a hotel called "What Cheer House." Subsequently he purchased an adjoining lot and erected a larger hotel. He operated both buildings under the mark "What Cheer House." Plaintiff surrendered the leased premises and continued to operate his hotel. Shortly thereafter, defendants purchased the original lot from the landlord and began operating the hotel as "Original What Cheer House." Plaintiff sought and received an injunction enjoining defendants from using the name "Original What Cheer House." In affirming the issuance of the injunction, the California Supreme Court stated:

> A person may have a right, interest, or property in a particular name, which he has given to a particular house, and for which house, under the name given to it, a reputation and good will may have been acquired; but a tenant, by giving a particular name to a building which he applies to

> some particular use, as a sign of the business done at that place, does not thereby make the name a fixture to the building, and transfer it irrevocably to the landlord.

Id. at 451-52. The court held that a "name is not a 'fixture'" that "becomes inseparably connected with the building to which it was first applied." Id. at 451.

Here, DPR fails to establish that the mere purchase of the property, without more, confers common law rights to the marks on DPR. Norden and O'Grady are not helpful to DPR – in both cases the landlord possessed trademark rights prior to leasing the properties. Here, in contrast, DPR is seeking to create rights where none existed. In Norden the landlord required the tenant to use the name "Fraunces Tavern Restaurant" and contractually provided that the tenant could not use the name at any other location. DPR fails to identify any contract whereby it required BDM to use either mark or otherwise limited BDM's use of the name to that particular location. Similarly, DPR's reliance upon O'Grady is misplaced. The court in O'Grady held that a tenant who operated the landlord's hotel business did not obtain any rights in the name even though the tenant increased the good reputation of the hotel. DPR fails to identify that it possessed any right to the marks prior to its purchase of the properties.

In sum, at this stage in the process DPR fails to establish the requisite likelihood of success on the merits.

The Concession Agreement Constitutes a License

In conclusory fashion, DPR contends that the Concession Agreement "operated as a service mark licensing agreement as a matter of law because it was a concession agreement." (Motion at p[.9:24-25). In reliance upon Quails v. Lake Berryessa Enterprises, Inc. 76 Cal.App. 4th 1277, 1284 (1999), DPR contends in a three sentence argument that the "concession agreement only grants a license in land, and does not convey any sort of title or possessory interest." (Motion at p.10:1-2). DPR fails to explain how this general principle of real property law applies to support its claim that the Concession Agreement, silent on the topic of intellectual property rights, can serve to establish rights in the marks. At this stage in the proceedings, DPR's failure to

provide any analysis or authority in support of its argument that a concession agreement operates, as a matter of law, as a trademark licensing agreement constitutes a failure to establish the requisite likelihood of success on the merits.

In a related argument, DPR contends that the signage clause in the Concession Agreement, requiring BDM to obtain DPR's approval prior to posting any "signs, name or placards" somehow converts DPR into the owner/licensor of the marks CASA DE BANDINI and CASA DE PICO. Defendants fail to identify any legal authority for this expansive proposition. Further, the intended purpose of the signage clause appears to be to control the aesthetics and appearances of the signage, and not to create intellectual property rights in the marks.[3] When viewed in this light, the signage clause appears designed to permit DPR to exercise discretion over the appearance of the signs. On the present record, the court declines to construe the signage clause as a provision regulating ownership of intellectual property rights.

In sum, DPR fails to establish the requisite likelihood of success on the merits.

DPR's Use of the Mark In Connection with Recreational Services

Among the arguments raised in its reply brief, DPR contends that it can establish prior use of the marks.[4] DPR contends that it used the marks in commerce in connection with the provision of recreational and tourism services in Old Town. Having established prior use for recreational and tourism services, DPR concludes that its common law trademark rights extend to related services such as restaurants.

When a geographic or historic mark is used as a descriptive term, the law requires a secondary meaning. See Armstrong Paint Varnish Works v. NuEnamel

---

[3] The concession agreements also authorize the state to maintain control over the rates and quality of service. (DPR Exh. 4, ¶14).

[4] Although the court has the discretion to decline to consider new arguments raised in reply briefs, see United States v. Bohn, 956 F.2d 208, 209 (9th Cir.1992) (per curiam) ("Although we ordinarily decline to consider arguments raised for the first time in a reply brief, we may consider them if, as here, the appellee raised the issue in its brief."), the court addresses DPR's prior use argument as this argument was extensively addressed by the parties at the time of oral argument and in the opposition and reply briefs.

Corp, 305 U.S. 315 (1938); Two Pesos, 505 U.S. 763. "The burden of proof of secondary meaning is upon the party trying to establish legal protection for the mark." McCarthy on Trademarks, §15.32. The evidentiary burden to establish secondary meaning for a geographically descriptive term is substantial. See Bank of Texas v. Commerce Southwest, Inc., 741 F.2d 785, 787 (5th Cir. 1984). The process by which a geographic or historic descriptive term like CASA DE BANDINI and CASA DE PICO may be transformed into a protectable trademark was explained in G.C. Merriam Co. v . Salfield, 198 F.2d 369 (6th Cir. 1912):

> There is nothing abstruse or complicated about this theory, however difficult its application may sometime be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase has come to mean that the article was his product; in other words, had come to be, to them his trademark.

McCarthy on Trademarks, §14.9 (quoting G.C. Merriam, 198 F.2d 269.); see North American Aircoach Systems v. North American Aviation, Inc., 231 F.2d 205, 208 (9th Cir. 1955). Further, an alleged senior user must prove the existence of secondary meaning in its mark at the time that the junior user began using the mark. See McCarthy on Trademarks, §16.34. Accordingly, DPR must establish a secondary meaning as of the time BDM started using the marks in relation to its restaurant businesses.

Among the factors analyzed to determine whether a term has acquired secondary meaning, the court considers:

> (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture.

Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 182 (1st Cir. 1993). Survey evidence is also "a well-recognized means of establishing secondary meaning." Id. Further, the court considers the "purposes for which plaintiff [business entity] was organized, its history as a business concern, the relationship of the public to the

activities so conducted and the good will built up in that business are important factors in determining the existence and extent of a secondary meaning of the name of plaintiff." North American Aircoach, 231 F.2d at 208.

DPR fails to meet its evidentiary burden. Pertinent factors are discussed in turn.

**The Length and Manner of Use**

DPR fails to present evidence of the length and manner of its use of CASA DE BANDINI and CASA DE PICO in relation to the provision of services. DPR's evidence establishes that both prior to and subsequent to its purchase of the Old Town property, numerous publications have discussed the historic nature of the buildings known as Casa de Bandini and Casa de Pico. (Patterson Decl. ¶¶ N, Q, R, S, T, U, V). DPR cites a brochure, purportedly Patterson Decl. Exh. N, wherein it indicates that the building Casa de Bandini housed the Fiesta 200 shops during the bicentennial of San Diego.[5] The same brochure also indicates that the building Casa de Bandini is "one of the finest early adobe houses, now an art gallery and Fiesta 200 headquarters." (Motion at p.4:4-5). DPR fails to identify key evidentiary facts: there is no evidence of the length and manner of DPR's use of the Fiesta 200 shops. Whether the shops, art gallery and headquarters were used for several days, weeks, months, or years has not been established.[6] This factor does not favor a finding of secondary meaning.

---

[5] Exhibit N, however, appears to have been copyrighted in 1950 and does not refer to Fiesta 200. Exhibit R appears to be the exhibit referred to by DPR.

[6] The court notes that the evidentiary record is far from clear. For example, the publications cited by DPR indicate that the building Casa de Bandini "was used as an art gallery and the headquarters for 'Fiesta 200.'" (Motion at p.4:1-2). It is unclear whether this statement means that the art gallery (or gift shop) was known as "The Casa de Bandini Art Gallery," or whether the activity (there is no evidence that the art gallery was a commercial enterprise or whether it was an art exhibit) identified therein was known as the "Art Gallery and Fiesta 200 Headquarters located in Casa de Bandini." The first name, "The Casa de Bandini Art Gallery," while descriptive, may be protected as a service mark upon proof that, through usage, the name has become distinctive such that the name has secondary meaning. See California Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451 (9th Cir. 1972). However, the second possible name, "Art Gallery and Fiesta 200 Headquarters located at Casa de Bandini," uses the name Casa de Bandini more as a geographic descriptive identifier, than as a service mark. In this later sense, the name is used to identify the location of the goods sold (or an art exhibit) at Case de Bandini. If used as a descriptive term to identify any

**The Nature and Extent of Advertising and Promotion of the Marks**

DPR has submitted to the court a copy of a brochure referring to the Fiesta 200 events at Old Town, including activities at Casa de Bandini and Casa de Pico. There is no evidence whether the brochures were provided to visitors, how many brochures were printed and distributed, and there is no evidence of any other advertising or promotional activity undertaken taken by DPR to promote the services and goods provided at Casa de Bandini and Case de Pico. This factor does not favor a finding of secondary meaning.

**DPR's Efforts to Promote a Connection Between the Marks and the Services Provided**

DPR's evidentiary record on this factor consists of the brochure prepared for the Fiesta 200 celebration. There is no evidence regarding advertising or other marketing efforts taken to promote the services and/or sale of goods at the Casa de Bandini and Casa de Pico locations in order to associate the marks with the services. This factor does not favor a finding of secondary meaning.

**Survey Evidence**

DPR has not submitted a consumer survey or testimony, by means of declaration or affidavit, of any other evidence of consumer opinion, beliefs, or associations. This factor does not favor a finding of secondary meaning.

**Other Factors**

DPR submits evidence that the buildings Casa de Pico and Casa de Bandini are registered landmarks. This is evidence that CASA DE PICO and CASA DE BANDINI are marks descriptive of the historical and geographical nature of the buildings. This is not evidence of secondary meaning. Further, DPR cites another brochure which indicates that consumers can "[e]njoy both Mexican and American food in 11 restaurants; visit 10 Historic Sites." (Reply, Exh. 1). DPR does not explain how this

---

particular goods or services being provided at Casa de Bandini, then it fails to serve the trademark function of distinguishing between goods or services.

evidence supports a finding of secondary meaning.

On the present record, DPR fails to make a sufficient showing of secondary meaning for the terms CASA DE BANDINI and CASA DE PICO. Absent evidence giving rise to an inference of secondary meaning, DPR fails to make the requisite showing of likelihood of success on the merits. See Arcamuzi, 819 F.2d at 937. The court emphasizes that this is not a finding that there are no circumstances under which DPR can demonstrate secondary meaning, rather, this is a limited finding that the evidence before the court at this point in time fails to give rise to an inference of secondary meaning. Similarly, this finding has no bearing on whether DPR could establish a fair use claim to the marks.

In sum, BDM's motion for judgment on the pleadings is denied and DPR's motion for preliminary injunction is denied.

**IT IS SO ORDERED.**

DATED: 5/17, 2005

JEFFREY T. MILLER
United States District Judge

cc: All parties